# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| TRISHA ANDERSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:13-1622 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

In this case seeking judicial review of denial of Supplemental Security Income benefits, Plaintiff Trisha Anderson has filed a Motion for Summary Judgment [Doc. # 13]. Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, has filed a response [Doc. # 14] seeking dismissal of the case, which the Court construes as a motion for summary judgment. The motions now are ripe for decision. Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court concludes that Defendant's request should be **granted** and that Plaintiff's Motion should be **denied**.

## I.   BACKGROUND

### A.   Procedural Background

Anderson filed an application for Supplemental Security Income ("SSI") benefits with the Social Security Administration on February 15, 2011, alleging disability beginning July 2, 2002.   Her claim was denied initially and on reconsideration.   Anderson then requested an administrative hearing before an Administrative Law Judge ("ALJ") to review the denial of benefits.

On June 20, 2012, ALJ Gerald L. Meyer held a hearing.  R. 27-50.  Anderson was represented by counsel, and a vocational expert appeared and testified.   In a decision dated August 15, 2012, the ALJ denied Anderson's request for benefits.  R. 13-22.   On December 20, 2012, the Appeals Council denied Anderson's request for review, rendering the ALJ's decision final.  R. 4-8.

Anderson filed this case on June 3, 2013, seeking judicial review of the Commissioner's denial of her claim for benefits.   Complaint [Doc. # 1].

### B.   Factual Background

Anderson claims that she is eligible for SSI benefits based on several mental health issues.   The ALJ found that Anderson suffers from schizoaffective disorder, post-traumatic stress disorder ("PTSD"), and borderline intellectual functioning. The relevant period for Anderson's benefit application is from February 15, 2011, the date

she applied for SSI, through August 15, 2012, the date of the ALJ's decision.

At the time of her SSI application in 2011, Anderson was 30 years old.  Her medical records contain her accounts of a traumatic childhood in which Anderson was sexually abused from infancy, removed from her mother's care, and raised in the foster care system.  She reported that she was hospitalized numerous times as a child.  She left school in eleventh grade when she ran away from home.  The record is inconsistent as to how many children Anderson has, but she apparently has at least five.  All of her children are being raised by others.

From approximately 2006-2011, Anderson was incarcerated by the Texas Department of Criminal Justice ("TDCJ").[1]  Upon her release from TDCJ, Anderson

---

[1]  Anderson reported in her medical records that she had been convicted for injury to her three-year-old child, but that her mother actually had beaten the child and then reported to Child Protective Services that Anderson had done it.  R. 377.

The record before this Court includes medical records from Anderson's last year of incarceration, from February 2010 through February 2011.  R. 326-65.  Because Anderson applied for SSI in February 2011, these TDCJ records are outside the Anderson's eligbility period.  The records demonstrate that, while in TDCJ, Anderson was treated for mental health issues, and took medications including Risperdal.  *See, e.g.*, R. 328.  The TDCJ records reflect a diagnosis of bipolar disorder, first observed in 2007.  R. 343.  In general, Anderson reported while incarcerated that her symptoms were well-controlled.  She did not report hallucinations, R. 341, 352, 353, although at times she reported depression.  R. 336.  She participated in group therapy and generally functioned well, with normal speech, eye contact, and emotional expression.  R. 336, 361.  She successfully worked in the prison kitchen without issues.  R. 341, 348, 352, 353, 364.  She reported in June 2010 that she was scheduled to be released in eight months but had nowhere to go and was "somewhat scared about getting out."  R. 355.

applied for SSI benefits.  She also received treatment at Austin Travis County Integral Care.  R. 366-73.  At her appointment on March 10, 2011, she stated that she was taking her medications, including Risperdal, regularly.  R. 367-68.  She reported irritability, agitation, and anxiety.  The staff conducted a Mental Status Examination upon intake and noted that Anderson appeared older than her stated age; that her behavior was distractable; that she had pressured speech, a flat affect, and dysphoric mood; that she had delusions, auditory hallucinations, and "loosening of associations (derailment)"; that she had no suicidal ideation; and, that her cognitive and intellectual functioning were within normal limits.  R. 368-71.  Anderson was strongly advised to take her medications regularly and was given a pill box to help her remember.[2]

On April 20, 2011, Anderson had a consultative examination with William J. Dubin, M.D., to evaluate her disability claims and her allegations of bipolar disorder and PTSD.  R. 374-81.  Dr. Dubin and his associates performed a record review, clinical interview, behavioral observations, and a Mental Status Examination.   Dr. Dubin noted Anderson's jittery pyschomotor activity and rapid speech, elevated mood, and that her affect was "fixed and smiling even when describing painful episodes."  R. 375.  Anderson reported that she had been on Risperdal and Paxil for

---

[2]     During the period from February through June 2011, Anderson was seen four times at the emergency department of the University Medical Center in Austin for complaints including vomiting, a contusion after a fall, foot pain, and throat pain.  R. 408-440.  None of these visits included treatment for mental health issues.

mental health issues since about age 17, but sometimes forgot to take the medications. She recounted flashbacks and nightmares related to multiple past rapes and to witnessing the death of the father of one of her children.  The report notes that she smiled as she reported that she was "scared and depressed all day long."  R. 376. Anderson also reported that she was getting only two or three hours of sleep per night due to nightmares and racing thoughts.  She recounted her history of a childhood in foster homes, molestation and rapes, institutionalization from ages 14-16, and leaving school in eleventh grade when she ran away from home.  She stated that she had four children, all of whom were with foster families or adopted.  She endorsed passive suicidal ideation but stated she needed to "be there" if her children needed her.  She stated that she was easily distracted, forgetful, had never held a job, and wanted to receive SSI benefits.  She also reported poor concentration and memory problems. She currently was living in an assisted living facility with a roommate, and stated that she did not feel she could live alone and adequately handle daily activities, although she stated inconsistently that she could handle daily activities such as bathing, grooming, and chores.  R. 377-78.  While recounting her chaotic and traumatic history, Anderson "maintained a fixed and cheerful affect and an elevated mood."  R. 378.

Dr. Dubin also performed a Mental Status Examination.  He recorded adequate

hygiene, jittery psychomotor activity, fixed eye contact, and "excellent efforts on tasks presented" during the examination, noting that Anderson had stated, "This is fun!" Her affect was cheerful, smiling, and unwavering.  Her speech was rapid and goal-directed with monotonous tone.  She was oriented to time, person, and place, and no deficits were noted in her cognition, memory, concentration or attention.  She displayed fair judgment and "little insight into her problems and psychological state." R. 378-79.   Dr. Dubin recorded diagnostic impressions of bipolar disorder, PTSD, and provisional diagnosis of borderline intellectual functioning with a "full battery strongly recommended."   He also noted a provisional diagnosis of borderline personality disorder with a full battery of testing recommended.  R. 379.   He concluded:

> Prognosis is poor that Ms. Anderson will assume adequate occupational or social functioning.  Her intellectual functioning appears borderline and her decision making process appeared impaired.  A full assessment is strongly recommended.  Vocational counseling is also encouraged to help Ms. Anderson acquire adaptive employment skills.

R. 380.  He further stated that Anderson would not be able to manage benefit payments.

On April 27, 2011, Anderson was seen at Austin Travis County Integral by Russell Bach, M.D. R. 382-89.  Anderson reported that she thought she was pregnant and wanted to keep the baby.  She recounted much of the same history and the same

symptoms as reported to Dr. Dubin, including mood swings, irritability, poor sleep, and auditory hallucinations of a male voice demanding suicide.  She stated that she was living in a halfway house "until she gets SSI restarted."  R. 386.  Her Mental Status Examination noted psychomotor agitation, normal speech and affect, anxious mood, delusions and auditory hallucinations, and normal cognition and intellectual function.  R. 388.  Dr. Bach opined that Anderson did not seem to have "true" bipolar disorder due to the pace of her mood swings, and that the auditory hallucinations and feelings of persecution could represent schizoaffective disorder.  R. 389.  He recorded diagnoses of schizoaffective disorder, PTSD, and borderline personality disorder.  R. 384.

Beginning in February 2012, Anderson was treated at MHMRA of Harris County, apparently having relocated to Houston.  R. 447-71, 474-89.  Anderson reported that she had given birth to a baby in December 2011 and expected to have her parental rights terminated.  R. 448, 453.  None of her other children were living with her.  R. 453.  She requested medication and housing, stating that she had been homeless for the past year and was living under a bridge with her boyfriend.  She continued to report symptoms such as disturbed sleep, racing thoughts, anxiety, irritability, nightmares and flashbacks, and impaired memory.  R. 453.  Her Mental Status Examination noted good eye contact, normal speech, depressed and worried

mood, appropriate affect, no suicidal ideation, fair insight and judgment, logical and goal-oriented thoughts, no delusions or hallucinations, and average intellectual functioning.  R. 460-61.  On February 13, 2012, Anderson returned requesting medication.  R. 448-52.  She complained of the same symptoms, but additionally of auditory and visual hallucinations, including voices telling her to kill herself, impulsive anger, and beating her head against a wall.   She provided inconsistent information during the interview and was judged an unreliable historian.  Her intellectual functioning was again assessed as average, and her prognosis as poor.

On March 12, 2012, at an appointment for medication maintenance, Anderson reported many of the same symptoms, but that her psychotic symptoms were improved with Risperdal.  R. 466-67.  Anderson reported that she had been working as a cook at a shelter.  She reported restlessness, excess energy, and decreased sleep. On the theory that her schizoaffective disorder was "overly activated" by Celexa, her medical providers instructed her to discontinue Celexa and to continue on Risperdal and Trazedone.

In March and April, Anderson continued treatment at MHMRA.  R. 474-89. She reported in March that she was much calmer and less depressed after discontinuing Celexa.  R. 486.  She was volunteering in the kitchen of the SEARCH shelter.   She reported problems with planning and organizing, including difficulty

remembering to shower, brush her teeth, and take her medications.   She was discontinued on Risperdal and started on Geodon. R. 487.   On April 16, she reported that her medications had been stolen after switching to Geodon and she had not taken medications in two weeks. R. 482-85.   After an episode of domestic violence, she had relocated to the Houston Area Women's Center.   She reported depression, increased auditory hallucinations, and voices telling her to kill herself.   On April 27, she reported that she had taken Geodon and Trazodone for three or four days but then stopped because of the medication's side effects.   She complained of mood swings, depression, anxiety, visual and auditory hallucinations, and nightmares and flashbacks.   R. 475.   She was recorded to have normal speech, anxious and depressed mood, labile affect, hallucinations, and suicidal ideation.   Her cognition was intact. R. 476-77.   Her examiner noted that her mood swings were evident during the interview, as she was "somewhat uncooperative and oppositional" at first, but after being redirected changed to happy and somewhat cooperative.   R. 477.

The record contains a letter from social worker Jill Lucas, LMSW, pertaining to Anderson.   In the letter dated March 26, 2012, Lucas stated that she had seen Anderson for about two months, and that Anderson had diligently attended her medical appointments and weekly meetings with Lucas.   She stated that Anderson had performed outside tasks upon which she and Lucas had agreed.   She also stated that

Anderson had difficulty remembering daily activities such as showering, brushing her teeth, and taking medications, and that her problems were exacerbated by homelessness.  R. 472-73.

## II.   __SUMMARY JUDGMENT STANDARD__

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.[3]  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4]  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[5]

---

[3]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

[4]   FED. R. CIV. P. 56(a).  *See Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

[5]   *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## III.   **STANDARD OF REVIEW**

Judicial review of the Commissioner's denial of disability benefits is limited to two inquiries: first, whether the final decision is supported by substantial evidence on the record as a whole and, second, whether the Commissioner applied the proper legal standards to evaluate the evidence.[6]  "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[7]  It is more than a mere scintilla and less than a preponderance.[8]

When applying the substantial evidence standard on review, the court scrutinizes the record to determine whether such evidence is present.[9]  In determining whether substantial evidence of disability exists, the court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.[10]  If the Commissioner's findings are supported by substantial evidence, they

---

[6]     *See Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

[7]     *Audler*, 501 F.3d at 447 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[8]     *Id.*; *Perez*, 415 F.3d at 461; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

[9]     *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

[10]    *Perez*, 415 F.3d at 462 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)).

are conclusive and must be affirmed.[11]   Alternatively, a finding of no substantial

evidence is appropriate if no credible evidentiary choices or medical findings support

the decision.[12]   The court may not, however, reweigh the evidence, try the issues *de

novo*, or substitute its judgment for that of the Commissioner.[13]   In short, conflicts in

the evidence are for the Commissioner, not the courts, to resolve.[14]

## IV.   <u>ANALYSIS</u>

### A.   <u>Statutory Basis for Benefits</u>

SSI benefits are authorized by Title XVI of the Social Security Act, and provide

an additional resource to the aged, blind and disabled to assure that their income does

not fall below the poverty line.[15]   Eligibility for SSI is based on proof of disability[16]

and indigence.[17]   A claimant applying to the SSI program cannot receive payment for

any period of disability predating the month in which he applies for benefits, no

---

[11]   *Id.* at 461 (citing *Richardson*, 402 U.S. at 390); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).

[12]   *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

[13]   *Audler*, 501 F.3d at 447; *Masterson*, 309 F.3d at 272.

[14]   *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272.

[15]   20 C.F.R. § 416.110.

[16]   42 U.S.C. § 1382c(a)(3) (definition of disability).

[17]   42 U.S.C. §§ 1382(a) (financial requirements).

matter how long he has actually been disabled.[18]   Thus, the month following an application fixes the earliest date from which SSI benefits can be paid.  Eligibility for SSI, unlike eligibility for Social Security disability benefits, is not dependent on insured status.

"Disability" is defined by the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[19]   The law and regulations governing the determination of disability for SSI are the same as those governing determinations for Social Security disability benefits.[20]

### B.   Determination of Disability

When determining whether a claimant is disabled, an ALJ must engage in a five-step sequential inquiry, as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations; (4) whether the claimant is capable of performing past relevant

---

[18]   *Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); 20 C.F.R. § 416.335.

[19]   42 U.S.C. § 1382c(3)(A).

[20]   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

work; and (5) whether the claimant is capable of performing any other work.[21]   The

claimant has the burden to prove disability under the first four steps.[22]  If the claimant

successfully carries this burden, the burden shifts to the Commissioner at Step Five

to show that the claimant is capable of performing other substantial gainful

employment that is available in the national economy.[23]   Once the Commissioner

makes this showing, the burden shifts back to the claimant to rebut the finding.[24]  A

finding that a claimant is disabled or is not disabled at any point in the five-step

review is conclusive and terminates the analysis.[25]

     In this case, the ALJ determined at Step One that Anderson had not engaged in

substantial gainful activity since February 15, 2011, her application date.  At Step

Two, he found that Anderson had three severe impairments: schizoaffective disorder,

PTSD, and borderline intellectual functioning.  At Step Three, the ALJ found that

Anderson's impairments, considered singly or in combination, did not meet or

---

[21]     *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.  The Commissioner's analysis at
     Steps Four and Five is based on the assessment of the claimant's residual functional
     capacity ("RFC"), or the work a claimant still can do despite his or her physical and
     mental limitations.  *Perez*, 415 F.3d at 461-62.  The Commissioner assesses the RFC
     before proceeding from Step Three to Step Four.  *Id.*

[22]     *Perez*, 415 F.3d at 461; *Myers*, 238 F.3d at 619.

[23]     *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.

[24]     *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.

[25]     *Perez*, 415 F.3d at 461 (citing 20 C.F.R. § 404.1520(a)).

medically equal an impairment listed in the Social Security regulations.

Before proceeding to Step Four, the ALJ found that Anderson had the residual functional capacity ("RFC") to perform work as follows:

> [Anderson] has the [RFC] to perform a full range of work at all exertional levels.  However, she would have nonexertional limitations.  She can understand, remember, and [carry out] only 1, 2, 3 step simple tasks that are routine and repetitive without frequent changes in duties.  There should be no work at an assembly line pace.  There should be no contact with the public and only occasional contact with co-workers and supervisors.

R. 17-18 .  At Step Four, the ALJ determined that Anderson was unable to perform any past relevant work.  At Step Five, he determined that, considering Anderson's age, education, work experience, and RFC, she was capable of performing jobs that existed in significant numbers in the national economy, in particular, laundry worker, kitchen helper, and housekeeper.  He therefore concluded that Anderson was not disabled.

## C.   Plaintiff's Arguments for Reversal

### 1.   Psychological and Intellectual Testing

First, Plaintiff argues for remand based the ALJ's failure to obtain additional testing for intellectual functioning, as recommended by Dr. Dubin, who conducted the consultative examination on April 20, 2011.   The record contains no IQ testing or scores.   Plaintiff argues that the ALJ erred at Step Three when, based on an insufficient record, he concluded that Anderson did not meet Listing 12.05 for

Intellectual Disability.[26]

As recounted above, Dr. Dubin's records noted Anderson's jittery psychomotor activity and rapid speech, elevated mood, and that her affect was "fixed and smiling even when describing painful episodes."  R. 375.  He noted no deficits in Anderson's cognition, memory, concentration or attention.  He recorded diagnostic impressions of bipolar disorder, PTSD, with provisional diagnoses of borderline intellectual functioning and borderline personality disorder, and recommended further testing on the provisional diagnoses.  R. 379.

Despite Dr. Dubin's recommendation, no further testing was done regarding Anderson's intellectual functioning.   The ALJ found at Step Two that borderline intellectual functioning was a severe impairment for Anderson, and then concluded at Step Three that Anderson did not meet the requirements for Listing 12.05.  In making his Step Three findings, the ALJ relied heavily on the absence of objective evidence that Anderson's IQ was low enough to satisfy the Listing. R. 17.

Whether additional testing would have been prudent is not the question before

---

[26]    Under Listing 12.05, "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. § 404, Subpart P, Appendix 1 (Listing of Impairments).

this Court.[27]  Rather, an ALJ's failure to fully and fairly develop the record is not a basis for reversal "unless the claimant shows that he or she was prejudiced by the ALJ's failure."  *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).  "To establish prejudice, a claimant must demonstrate that he or she 'could and would have adduced evidence that might have altered the result.'"  *Id.* (quoting *Kane v. Heckler,* 731 F.2d 1216, 1220 (5th Cir. 1984)).

The April 2011 examination by Dr. Dubin, and his recommendation for additional testing, were in the record before the ALJ.  Anderson, represented by prior counsel, did not request further testing.  Plaintiff has not submitted any testing results herself, and has not alleged what such further testing would show.  Moreover, other relatively recent evidence in the record assessed Anderson as having cognitive and

---

[27]  This Court's scope of review is limited to whether the ALJ's decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards to evaluate the evidence.  *Audler*, 501 F.3d at 447.  Although Plaintiff argues that the ALJ erred when he failed to order the additional testing recommended by the consultative examiner, she cites no authority stating that the ALJ was obligated to do so.  Plaintiff cites to 20 C.F.R. § 416.919a(b)(1), which states that the SSA "may purchase a consultative examination" to obtain "needed medical evidence."  The SSA in this case did purchase a consultative examination, performed by Dr. Dubin.  Because the cited regulation has no provision regarding required follow-up testing, this regulation does not mandate further relief for Anderson.  Anderson also cites to Listing 12.00D(6)(B), which states, "Standardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A. Listing 12.05A may be the basis for adjudicating cases where the results of standardized intelligence tests are unavailable, *e.g*., where your condition precludes formal standardized testing."  20 C.F.R. § 404, Subpart P, Appendix 1 (Listing of Impairments).  This section also does not require an ALJ to order testing or provide a remedy for failure to do so.

intellectual functioning within normal limits.  *See*, *e.g.*, R. 370, 388, 451, 461.

Because Plaintiff has not shown prejudice, summary judgment is granted for Defendant.

### 2. Whether Plaintiff Met Listing 12.04 for Schizoaffective Disorder

Second, Plaintiff argues that the ALJ erred when he found at Step Three that Plaintiff's schizoaffective disorder did not meet the requirements of Listing 12.04 (affective disorders).  The ALJ only considered whether Anderson's impairment satisfied Listings 12.03 (schizophrenic, paranoid and other psychotic disorders), 12.05 (intellectual disability), and 12.06 (anxiety-related disorder).  Anderson now argues that the ALJ erred in failing to evaluate the requirements of Listing 12.04 and in failing to find that Anderson's impairment met those requirements.  Anderson's counsel argued at the administrative hearing that Listing 12.04 applied.

Listing 12.04 states that affective disorders are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome," and is divided into Sections A, B, and C.[28]  Section A sets forth definitions of depressive syndrome, manic syndrome, and bipolar syndrome; Section B discusses restrictions in daily activity, social functioning, or concentration/persistence/pace, as well as decompensation; Section C sets forth criteria for chronic disorders of at least two

---

[28]     *See* 20 C.F.R. § 404, Subpart P, Appendix 1 (Listing of Impairments).

years' duration.   The Listing requires an individual to either satisfy the requirements of Sections A and B together, or to satisfy Section C.   Anderson argues that her impairment satisfies Sections A and B, and requests reversal or remand.

The Court will assume *arguendo* that Anderson satisfies Section A's criteria for depressive syndrome.[29] As for Section B, Anderson argues that the Listing is satisfied because the record evidence demonstrates "marked" restrictions in both daily living and social functioning.  Although the ALJ did not explicitly consider Listing 12.04, he considered other listings with requirements identical to Section B, and concluded that Anderson had only mild restrictions both in activities of daily living and in social functioning.  R. 16.  Because Section B requires a showing of "marked" limitations in at least two categories, Anderson must show a lack of substantial evidence supporting the ALJ's conclusion regarding **both** activities of daily living and social functioning.[30]

Regarding daily living, Anderson points to evidence in the record reflecting her

---

[29]   Anderson's briefing cites to evidence of anhedonia, sleep disturbance, psychomotor agitation, suicidal ideation, and hallucinations, all of which are enumerated in Section A.

[30]   Section B of Listing 12.04 requires satisfaction of **at least two** of four categories: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  *See* 20 C.F.R. § 404, Subpart P, Appendix 1 (Listing 12.04(B)).  Anderson has not made any argument regarding the ALJ's findings on the remaining two categories.

reports that she needs reminders regarding basic personal hygiene, *see* R. 38 (Anderson's testimony at administrative hearing), R. 473 (letter from social worker on Anderson's behalf), R. 486 (MHMRA records); that she needs help to manage money, seek information, or make appointments, *see* R. 377 (Dr. Dubin's report); and that she was unable to perform her kitchen duties at the homeless shelter when the person instructing her was absent, *see* R. 42-43 (Anderson's testimony at administrative hearing).

Despite the evidence cited by Plaintiff, the record contains substantial evidence supporting the ALJ's conclusion. *See Audler*, 501 F.3d at 447 ("substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion). For example, as to activities of daily living, the record contains evidence that Anderson at times has been capable of daily activities such as personal hygiene and chores. Dr. Dubin's statement in his report reflected these capabilities:

> Ms. Anderson endorsed capability for handling her bathing and grooming activities on her own ('I'll forget for a few days sometimes'), as well as operating appliances, handling chores around the house and using a telephone. She requests help when she has to manage her income, handle money, look up information, drive or make appointments. Ms. Anderson endorsed no interest in preparing food for herself.

R. 377. This assessment supports the ALJ's finding of mild restrictions. Similarly, Robert B. White, Ph.D., who reviewed records for the SSA, opined on June 2, 2011,

that Anderson had "no indication of any significant limitations in [activities of daily living] or overall social/functioning."  R. 402.  Substantial evidence supported the ALJ's finding that Anderson's limitations in activities of daily living were mild—or, as relevant to whether Anderson satisfied Section B of Listing 12.04, the ALJ's implied finding that Anderson did not have "marked" limitations in activities of daily living.[31]

Because substantial evidence supports the conclusion that Anderson did not satisfy Listing 12.04 during the relevant period,[32] the findings are conclusive and must be affirmed.  *Perez*, 415 F.3d at 462; *Watson*, 288 F.3d at 215.  Conflicts in the evidence are for the Commissioner, not the courts, to resolve.  *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272.

## V.     **CONCLUSION**

For the foregoing reasons, it is hereby

---

[31]    Regarding social functioning, Anderson directs the Court's attention to evidence that Anderson is unable to get along with others and has  paranoia, impulse control issues, and irritability, resulting from her lengthy history of sexual abuse.  Plaintiff's Motion, at 9 (citing record).  Defendant's briefing cites to other parts of the record in which Anderson was reported to be cooperative and appropriate. *See*, *e.g.,* R. 449, 460, 483.  Given the holding above regarding activities of daily living, the Court need not address the ALJ's finding that Anderson had only mild difficulties in social functioning.

[32]    The eligibility period addressed by the ALJ was from February 15, 2011 (the date of Anderson's SSI application) through August 15, 2012 (the date of the ALJ's decision denying benefits).  The Court does not address Anderson's eligibility for benefits in later periods.

**ORDERED** that Defendant's request for summary judgment in its Response Brief [Doc. # 14] is **GRANTED**.  It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 13] is **DENIED**.

A separate final judgment will issue.

SIGNED at Houston, Texas, this **18th** day of **March, 2014**.

Nancy F. Atlas
United States District Judge